Filed 4/29/21  P. v. Saterfield CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C089886 |
| Plaintiff and Respondent, | (Super. Ct. No. 17FE008865) |
| v. | |
| RICHARD SATERFIELD, | |
| Defendant and Appellant. | |
| THE PEOPLE, | C089944 |
| Plaintiff and Respondent, | |
| v. | |
| HIEU HOANG, | |
| Defendant and Appellant. | |

1

Defendant Richard Saterfield brought a gun into a store where codefendant Hieu Van Hoang was eating, claiming he was being followed.  Minutes later, Hoang fatally shot two teenage brothers in the store's parking lot, with the gun supplied by Saterfield.  The two defendants were tried together.  A jury found both guilty of two counts of first degree murder (Pen. Code, § 187),[1] and found true various firearm enhancements.  The trial court imposed consecutive sentences of life without parole (LWOP), plus additional terms for firearm enhancements.

On appeal, both defendants contend the trial court improperly provided the jury with instructions that restricted their right to self-defense.  Saterfield adds that the prosecutor committed multiple acts of misconduct in closing argument and claims his mandatory LWOP sentence is unconstitutional.

As we explain, we disagree and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution Witnesses*

In May 2017 Saterfield went to a store to have lunch with Hoang and Hoang's friend.  When they arrived, Saterfield told the other two he was not hungry and wanted to make a purchase at a nearby pharmacy.

Saterfield, 21 years old at the time, returned to the store about 15 minutes later, while Hoang and his friend were still eating, and told Hoang that "some guys [are] following me outside.  We might want to do something with them."  Saterfield did not appear nervous or agitated to a store employee who saw him return and speak to his companions and nothing about Saterfield's behavior worried Hoang's friend.

Saterfield was holding Hoang's backpack (bag) that had been left inside the vehicle that transported the group to the store; Hoang's gun was inside the bag.

---

[1]  Further undesignated statutory references are to the Penal Code.

Saterfield and Hoang left the store together and had an animated conversation with two males who stood a few feet away from them and "looked angry," according to Hoang's friend, who remained inside the store.

During the confrontation, Hoang took his gun from the bag and fatally shot the two males, teenage brothers Daniel "Robert" Murti and Sergio Murti. Sergio died on the spot, but Robert ran away.

Immediately after that shooting, both defendants got into Hoang's car, and drove away as more gunshots were fired from the car.

Video footage and eyewitness testimony indicated that, mere minutes before the shooting, Saterfield crossed paths with the Murti brothers and their female companion at a nearby liquor store. After Saterfield left the liquor store, one Murti brother commented to the other that "somebody across the street was . . . waving them down or saying something to them." The Murti brothers and their companion crossed the street toward the shopping mall that housed the store where Hoang was eating lunch. Five minutes later, the brothers' companion (who did not accompany the brothers to the store where Hoang was eating) heard about eight gunshots, and then saw Robert swaying and walking slowly toward her, with blood on his white shirt. She heard tires screeching, and around five more gunshots, as Robert "lean[ed] forward," trying to duck the shots. The companion ran to Robert and held him as he fell to the ground.

An autopsy revealed that both Murtis died from multiple gunshot wounds. Robert suffered two gunshots to the torso. Sergio suffered gunshots to the torso, thigh, and buttocks. Multiple civilian witnesses who were in and around the various commercial establishments near the shooting provided testimony about their percipient observations.

*Hoang's Testimony*

Saterfield did not testify; Hoang did.

Hoang explained that when Saterfield returned to the store where Hoang was eating and--while holding the bag that had been left in the car--told Hoang that "some

3

niggas [were] following him," Hoang realized they "were in trouble and [they] might have to use" the gun that was in the bag. Hoang ate more food and then joined Saterfield (who was still holding the bag) at the front of the store. Saterfield said, "that's them right there," indicating the Murti brothers, who were walking in a parking lot towards defendants. The Murti brothers "looked mad and agitated," and were waving at defendants to come out of the store. They had their hands in their pants, suggesting to Hoang (given his experience with two episodes of gun violence in the months before this incident) that they were concealing a gun and were rival gang members who wanted to harm Hoang and Saterfield.

As defendants left the store, Saterfield passed the bag containing the gun to Hoang, and the Murti brothers advanced toward defendants, appearing "more, more agitated" and "more, more angry." They said, "What were you throwing up, nigga? Where you from?" "This is Oak Park. You don't belong here." This led Hoang to conclude the brothers were gang members asserting that defendants were "in their territory" and that the brothers thought defendants were rival gang members. Hoang thought that Saterfield may have made gang signs at them when he was away from the store while Hoang was eating. Saterfield replied that he was from Oak Park. Hoang testified that he was a gang member himself, who "grew up with gang members or in bad neighborhoods" and feared the Murti brothers would shoot him and Saterfield. He removed his gun from the bag and "racked a bullet in the chamber" "right in front of" the brothers, who continued advancing towards Hoang and Saterfield with their "hands in their pants fidgeting."

Hoang testified that he believed the brothers were armed and that "it was . . . defend [him]self or die." He fired his gun at the Murti brothers, ran to his car, and drove away with his friend and Saterfield.

*Video Evidence*

Video footage admitted at trial showed as follows: Saterfield comes to the store (holding the bag) where Hoang is eating lunch at a table with his friend, and speaks to Hoang around 11:58:12; Satterfield walks a short distance away from the table to look outside, and speaks to Hoang again at 11:58:23; Satterfield walks away from the table a second time, this time walking all the way to the front door, looks outside around 11:58:48, and walks back towards Hoang; at 11:59:04 Saterfield and Hoang together approach the front door of the store as they look outside; around 11:59:07 the Murti brothers appear outside the store, walking parallel to the front door, on the other side of several cars parked immediately in front of the store; around 11:59:12 Saterfield opens the front door with his left hand and steps outside as, with his right arm, he extends the open bag behind him to Hoang, who takes the bag at 11:59:14, as defendants take a few steps toward the Murti brothers and away from the front door; between 11:59:15 and 11:59:19, the Murti brothers walk toward defendants; around 11:59:20, Saterfield takes a step or two closer to one of the Murti brothers, and the other Murti brother walks closer to both defendants; at 11:59:24, Hoang fires the gun.

No evidence was introduced at trial indicating that either Murti brother actually possessed a weapon at the time of the shooting.

*Closing Arguments*

The prosecutor argued to the jury that "[s]omething happened between the liquor store" and the store where Hoang was eating lunch, "[w]e know that." "Now, what we also know is that [] Saterfield almost certainly started it," because the Murti brothers' attention "appear[ed] to turn to whatever [] Saterfield [was] doing . . . across the street." "We know that [] Saterfield . . . chose to obtain the gun and bring it into play. Without that act, this is a fistfight at worst." The prosecutor's theory as to Saterfield was that he intended to kill the Murti brothers and aided the shooting by giving Hoang the bag with the gun.

As for Hoang, the prosecutor argued he was "preparing to shoot before [he] stepped outside . . . before there's an angry confrontation," which was inconsistent with a self-defense theory. "If you're terrified, if you really think your life is in danger, what do you do? You stay inside. You call the police. You ask for help. No reasonable person steps outside of safety to confront this terribly fearsome thing. Ever. You step outside when you want to confront and commit violence."

Hoang's counsel argued the Murti brothers began the escalation at the liquor store when they agreed to "go check . . . out" what Saterfield was communicating to them, across the street. Then, as depicted in the video footage, the brothers "moved up aggressively" toward defendants. Counsel argued the jury could "see the angry look on the face" of one of the brothers "at 11:59:20. Does that support what [] Hoang says that the Murtis were angry? They had their hands in their pants, which made [Hoang] believe they had a gun. It was something he's seen before." "If you know the meaning of somebody with their hands down their pants trying to convince you that they are armed to continue their progression and their escalation of this, it becomes highly significant." Counsel emphasized that "after [Hoang] racked his gun, they kept pressing up, they kept pressing up. . . . The Murtis wanted to build th[e] tension and to progress this and accelerate this." Hoang, "believed that these guys were armed," and he was "sitting there with his gun racked and that would not stop . . . the Murtis' progression. It was the Murtis' acceleration of the events."

Saterfield's counsel suggested the evidence did *not* demonstrate that Saterfield "started the ball rolling" by "do[ing] something provocative over at the liquor store." Rather, Saterfield was "concerned" that the Murti brothers were "following [him], and he's pacing" in the store, and the jury should not "guess . . . wrong" why Saterfield got the bag out of Hoang's car and brought it into the store, because "[g]reat number[s] of people have guns for protection." A reasonable view of the facts could be that Saterfield

6

"took [] Hoang out there as a show of force to tell [the Murti brothers] to shut up and leave us alone." "Not violence. Protection."

*Verdicts and Sentences*

The jury found defendants each guilty on two counts of first degree murder (§ 187, subd. (a)) and found true that: they committed multiple murders within the meaning of section 190.2, subdivision (a)(3); Hoang personally and intentionally discharged a firearm which caused the Murti brothers' deaths (§ 12022.53, subd. (d)); and Saterfield personally and intentionally discharged a firearm in the commission of murder (§ 12022.53, subd. (c)).

In July 2019 the trial court sentenced each defendant to consecutive LWOP terms for the two special circumstance murders. The court added 25 years to Hoang's sentence and 20 years to Saterfield's sentence for their respective firearm enhancements. Both defendants timely appealed.

## DISCUSSION

### I

### *Jury Instructions*

Both defendants claim the trial court erred in instructing the jury with CALCRIM Nos. 3471 [Right to Self-Defense: Mutual Combat or Initial Aggressor] and 3472 [Right to Self-Defense: May Not Be Contrived]. We see no error.

A. *Background*

The trial court instructed the jury that "[s]ome of the[] instructions [might] not apply, depending on [the jury's] findings about the facts of the case," and that the jury had to "separately consider the evidence as it applie[d] to each defendant . . . separately." The court also instructed on, inter alia, an aider and abettor's liability for an intended crime (CALCRIM No. 401), justifiable homicide due to self-defense (CALCRIM No. 505), and voluntary manslaughter culpability resulting from imperfect self-defense (CALCRIM No. 571).

7

Over objection, the trial court instructed the jury pursuant to CALCRIM No. 3471 that: "A person who engaged in mutual combat or who starts a fight has a right to self-defense only if: [¶] One, he actually and in good faith tried to stop fighting; [¶] Two, he indicated by word or by conduct to his opponent in a way that a reasonable person would understand that he wanted to stop fighting and that he had stopped fighting; [¶] And three, he gave his opponent a chance to stop fighting. [¶] If a defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight.

"However, if the defendant used only nondeadly force and the opponent responded with such sudden and deadly force that a defendant could not withdraw from the fight, then a defendant had the right to defend himself with deadly force and was not required to try to stop fighting . . . .

"A fight is mutual combat when it began by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose."

At Hoang's counsel's request, the court added the following language not in the CALCRIM No. 3471 pattern: "The words combat and fight mean to engage in a violent struggle or battle involving physical contact and not merely to engage in a verbal argument, dispute or taunting."

At a hearing on the proposed jury instructions, Hoang's counsel argued there was no "evidence of actual mutual combat or evidence of a fight to confrontation" to justify CACRIM No. 3471. He argued that the instruction was "not for a confrontation where somebody believes there's a threat of being shot or robbed. It's not the situation we have." Saterfield's counsel argued: "[T]here's a difference between fighting and confrontation. . . . I think we had a confrontation. And both parties were involved in it, all four of them. The question is can confrontation be made equal to combat and fight."

Without objection, the trial court also instructed the jury with CALCRIM No. 3472: "A person does not have the right to self-defense if he provokes a fight or a quarrel with the intent to create an excuse to use force."

B. *Analysis*

Saterfield contends CALCRIM No. 3471 was not supported by substantial evidence, and that its provision to the jury, combined with the prosecutor's argument, diminished the prosecution's burden of proof "on an essential element of the crime of murder," and prejudicially violated his rights to present his defense and to a fair trial. As for CALCRIM No. 3472, Saterfield acknowledges it correctly states the law "in some circumstances," but argues its provision to the jury in this case "improperly restricted the availability of self-defense," in part because it "undermined Hoang's testimony about feeling afraid of escalating violence because of his personal experience."

Hoang similarly contends CALCRIM No. 3471 was not supported by substantial evidence. He argues Saterfield's communication with the Murti brothers before coming back to the store did not "forfeit [Hoang's] right to claim self-defense and imperfect self-defense," because "[w]hatever Saterfield said or did when he was across the street by the liquor store . . . did not rise to the level" necessary to justify CALCRIM No. 3471. As for CALCRIM No. 3472, Hoang argues it should not have been given because "there was no evidence to show Saterfield, much less Hoang, intended to provoke the Murti brothers in order to shoot them."

Hoang further contends provision of CALCRIM Nos. 3471 and 3472 implicated his constitutional rights to a jury trial and due process by "effectively negat[ing]" his theories of self-defense and imperfect self-defense, because "if the jurors believed Saterfield started the verbal confrontation, the jurors would have concluded from CALCRIM No. 3471 [that] Hoang was not able to claim self-defense because Hoang did not affirmatively withdraw from the confrontation."

9

The People contend substantial evidence supported giving CALCRIM No. 3471, and, even if improper, any error was harmless because of the paucity of evidence supporting a self-defense claim. The People further contend both defendants' appellate challenges to CALCRIM No. 3472 are forfeited for failure to object or seek to modify at trial.

### 1. *General Principles*

A trial court should give a requested instruction only if it is supported by substantial evidence, which is " 'evidence that a reasonable jury could find persuasive.' " (*People v. Kanawyer* (2003) 113 Cal.App.4th 1233, 1243; see *People v. Leon* (2020) 8 Cal.5th 831, 848.)

" 'We determine whether a jury instruction correctly states the law under the independent or de novo standard of review. [Citation.] Review of the adequacy of instructions is based on whether the trial court "fully and fairly instructed on the applicable law." [Citation.] " 'In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' [Citation.]" [Citation.] "Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible [of] such interpretation." [Citation.]' [Citation.]" (*People v. Wetle* (2019) 43 Cal.App.5th 375, 381-382.)

### 2. *Forfeiture of the challenge to CALCRIM No. 3472*

A party forfeits any challenge to a jury instruction that was correct in law and responsive to the evidence if the party failed to object in the trial court. (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012; see *People v. Nguyen* (2015) 61 Cal.4th 1015, 1051 ["If defendant believed the instruction was incomplete or misleading, he 'had the obligation to request clarifying language' "].) This rule does not apply if the instruction was an incorrect statement of law (*Hudson,* at p. 1012), nor does it apply if the

instructional error affected defendant's substantial rights (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087).  Thus, in order to determine whether defendants forfeited their arguments as to CALCRIM No. 3472, we must first determine whether the instruction was a correct statement of the law and responsive to the evidence, and whether it affected defendants' substantial rights.  (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.)

CALCRIM No. 3472 reads:  "A person does not have the right to self-defense if he provokes a fight or a quarrel with the intent to create an excuse to use force."  This is a generally correct statement of law (see *People v. Eulian* (2016) 247 Cal.App.4th 1324, 1333) and it was responsive to the evidence, as the record suggests that Saterfield lured the Murti brothers away from the liquor store and toward Hoang (provocation), and then escalated the situation by bringing a gun into the store and telling Hoang that he was being followed and that the two "might want to do something" about it (intent to create an excuse to use force).

The contention that *People v. Ramirez* (2015) 233 Cal.App.4th 940 teaches that CALCRIM No. 3472 required modification in the instant case is unpersuasive.  In *Ramirez*, the appellate court concluded the instruction did not accurately state governing law as to the facts before it because "one who provokes a fistfight" still retains the right of self-defense "*if the adversary resorts to deadly force*." (*Ramirez,* at p. 947, italics added.)  *Ramirez* is distinguishable, because here there was substantial evidence that Saterfield provoked a *gunfight*, not a fistfight.  A gunfight is deadly at the outset.  Having provoked a gunfight, Saterfield did not retain the right to claim self-defense in connection with the Murti brothers' deaths.

Thus, CALCRIM No. 3472 adequately instructed the jury on the law, and defendants' substantial rights were not affected.  Defendants have forfeited their challenge by failing to object or request modification in the trial court.

11

### 3. *CALCRIM No. 3471*

In *People v. Ross* (2007) 155 Cal.App.4th 1033, cited by all parties' briefing, the defendant was convicted of aggravated assault and battery after the trial court instructed the jury, over defense objection, that the defendant had not acted in self-defense if he had been engaged in mutual combat with the alleged victim. (*Id.* at p. 1036.) The appellate court reversed the judgment, explaining the doctrine of mutual combat contemplates "fighting by mutual intention or consent, as most clearly reflected in an express or implied *agreement* to fight. The agreement need not have all the characteristics of a legally binding contract; . . . . But there must be evidence from which the jury could reasonably find that *both combatants actually consented or intended to fight before the claimed occasion for self-defense arose*." (*Id.* at pp. 1046-1047.)

Here, Saterfield communicated with the Murti brothers to get them to follow him across the street; he brought a gun into the store; he told Hoang that multiple males were following him and that defendants "might want to do something with them"; he pointed the victims out to Hoang as they approached the store; he gave the gun to Hoang as defendants stepped out of the store; he advanced on the Murti brothers as they initially confronted defendants; and he continued to advance on the brothers moments before Hoang fired his gun. On those facts, a jury could reasonably find that there was at least an implied agreement to fight between Saterfield and the Murti brothers. Accordingly, CALCRIM No. 3471 was potentially applicable to Saterfield.

As for Hoang, the evidence showed that he was seated and eating lunch with a friend when Saterfield returned to the store (carrying his bag which Hoang knew to contain his gun) and told him that multiple males were following him, leading Hoang to conclude defendants "were in trouble and . . . might have to use" the gun. After close to a minute, Hoang joined Saterfield at the store's front door, where Saterfield pointed out the Murti brothers. The brothers appeared angry and agitated and were waving at defendants to come out of the store. They had their hands in their pants, suggesting to

12

Hoang that they were hiding guns and wanting to harm defendants. Hoang accepted the bag from Saterfield as the two stepped outside and confronted the victims.

On those facts, a jury could reasonably conclude that there was an implied agreement to fight between Hoang and the Murti brothers before the claimed occasion for self-defense arose. (*People v. Ross, supra*, 155 Cal.App.4th at p. 1046-1047.) Accordingly, CALCRIM No. 3471 was proper as to Hoang.

As to both defendants, the prosecutor's closing argument was in line with the evidence and CALCRIM No. 3471 (as well as CALCRIM No. 3472): "If you're terrified, if you really think your life is in danger, what do you do? You stay inside. . . . No reasonable person steps outside of safety to confront this terribly fearsome thing. Ever. You step outside when you want to confront and commit violence."

The jury was told that some instructions may not apply to the facts as it found them, and that it had to "separately consider the evidence as it applie[d] to each defendant separately." Thus, if the jury found that Saterfield started the fight and applied CALCRIM No. 3471 to his self-defense claim, but decided Hoang was ignorant of Saterfield's role, the jury was told that the instruction did not apply to Hoang merely by virtue of its application to Saterfield. For that reason, Hoang's contention that CALCRIM No. 3471 "effectively negated" his self-defense theories fails to persuade, as the jury would not necessarily have concluded that Hoang had no right to self-defense if it found that Saterfield started the fight. Further, Hoang's argument ignores that the trial court instructed the jury (at his request) that "combat" and "fight" excluded a "verbal argument, dispute or taunting." Contrary to Hoang's contention, any juror's belief that Saterfield started a verbal confrontation would not lead to the conclusion that Hoang had no right to self-defense, as the jury was told the instruction did not apply to words alone. For all these reasons, CALCRIM No. 3471 was properly given.

13

## II

### *Prosecutorial Misconduct*

Saterfield contends the prosecutor committed multiple acts of misconduct in closing argument. The People contend all but one of his arguments are forfeited. As we describe below, only one objection to the challenged argument was voiced by his counsel, and although Saterfield argues that we should excuse this failure to object based on futility, we disagree. That one objection was sustained, and although the trial court declined to "strike" the argument at issue, the court was not asked to admonish the jury further and there is no indication that any further objections or properly made requests to admonish the jury would have been futile. "As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion--and on the same ground--the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

However, because Saterfield argues that any failure to preserve a claim was ineffective assistance of trial counsel, we will address the merits of any forfeited claims of prosecutorial misconduct under the rubric of ineffective assistance of counsel.

A. *General Principles*

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury. Furthermore, and particularly pertinent here, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Morales* (2001) 25 Cal.4th 34, 44.)

14

"At closing argument a party is entitled both to discuss the evidence and to comment on reasonable inferences that may be drawn therefrom." (*People v. Morales, supra*, 25 Cal.4th at p. 44.) "Within the scope of permissible prosecutorial argument, a prosecutor is given wide latitude during argument ' " ' "as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. . . ." ' " ' [Citation.]" (*People v. Sanchez* (2014) 228 Cal.App.4th 1517, 1529.)

"[W]e must reject" an ineffective assistance claim on direct appeal " ' "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." ' " (*People v. Caro* (2019) 7 Cal.5th 463, 488.) In the context of a failure to object to a prosecutor's closing argument, there are " 'many reasons' " why " '[a]n attorney may choose not to object, . . . and the failure to object rarely establishes ineffectiveness of counsel,' " (*People v. Avena* (1996) 13 Cal.4th 394, 420-421 (*Avena*)), as "[c]ounsel could reasonably have decided it was better to let the comment[s] stand than risk irritating the jury by objecting" (*People v. Anzalone* (2006) 141 Cal.App.4th 380, 395 (*Anzalone*)).

B. *Alleged Instances of Misconduct*

1. *Appealing to Passions and Sympathy*

The prosecutor began his closing remarks by telling the jury: "If before this trial you were not the type of person that when you saw on the news . . . some victim being . . . wounded or killed, if you weren't the type of person that reflected on the real human cost that that involves, you will be now. Unfortunately . . . you've learned what it looks like when people are gunned down. You've learned what it looks like when two brothers, boys really, fifteen, nineteen, are killed. When a family loses two sons." Hoang's attorney objected as "[a]ppealing to passion." The trial court sustained the objection. Hoang's attorney then said: "Move to strike." The court responded: "What attorneys say is not evidence, so there's really nothing to strike."

15

Saterfield contends that by refusing to strike the prosecutor's comment (and seemingly to admonish the jury, which we note the court was not asked to do), the trial court prejudicially failed to tell the jurors "that they could not consider passion or sympathy," and "made further objection to prevent the prejudice from repeated misconduct futile." The People argue the isolated remark by the prosecutor was not prejudicial, and we agree with the People on this point.

The trial court sustained the objection, and though it did not specifically admonish the jury to disregard the challenged statement, it did generally instruct the jury that the attorneys' arguments were not evidence and also that the jury was to disregard attempts to appeal to its sympathy. Further, the statement was isolated and not repeated. (See *People v. Pensinger* (1991) 52 Cal.3d 1210, 1250-1251 [rejecting a prejudicial error argument where the prosecutor appealed to the jury's passion in closing argument when the prosecutor said " 'suppose . . . this had happened to one of your children,' " defense counsel objected, and the trial court sustained the objection but did not admonish the jury to disregard the statement, as "the prosecutor's comment was an isolated one and it was not repeated"].)

Saterfield points to two additional instances of alleged improper argument, which were not objected to, under the same subheading. First, the prosecutor said: "You've seen the cost. And you will be able to reflect in your mind that you sat on one of the most brazen, heinous, dangerous cases that could have possibly happened." Defendant contends this comment was "geared to incite sympathy and passion." But the prosecutor's characterization of the noontime shooting in a commercial area populated by multiple bystanders as "brazen," "heinous," and "dangerous" was arguably fair comment on the evidence. (See *People v. Martinez* (2010) 47 Cal.4th 911, 957 ["The prosecution's description of [the victim] 'suffering' a 'savage beating' and the comment about how it reflected defendant's 'violent capabilities' were fair comments on the evidence"]; *People v. Young* (2005) 34 Cal.4th 1149, 1195 [no misconduct where prosecutor characterized

16

crimes as " 'serial killing,' " and " 'terrorizing and killing' " people].)  Any objection would have merely drawn attention to the argument, whether the objection was sustained or not; refraining from objecting was arguably a reasonable tactical choice by counsel, particularly given that the remarks were not obviously improper.  (*Avena, supra*, 13 Cal.4th at pp. 420-421; *Anzalone, supra*, 141 Cal.App.4th at p. 395.)

Second, in rebuttal argument, the prosecutor took issue with defense counsels' arguments that the jury should consider the "cultural divide" when judging the reasonableness of defendants' conduct.  The prosecutor explained:  "The argument they were making is essentially that if you grow up in a bad neighborhood, if you grow up impoverished, if you grow up in those situations, somehow we should expect you to be morally bankrupt"; and "[e]ssentially what they are saying is this is how you roll in the hood.  This is how it goes.  You may not understand it, but this is the way it is.  [¶]  Well, my question to you, ladies and gentlemen, the twelve of you, whose hood is this?  And I'm talking about the courtroom.  I'm talking about the City of Sacramento. . . .  That's why we have these reasonableness standards in the law.  [¶]  . . . You guys get to say what is normal, acceptable, and reasonable."

Defendant contends "[t]his was both an appeal to prejudice" and an appeal to the jury to " 'protect community values' " as the " ' "conscience of the community." ' " First, the argument was arguably proper.  (See *People v. Adanandus* (2007) 157 Cal.App.4th 496, 511-513 [prosecutor's argument that the jury could restore law and order to the neighborhood was "an appeal for the jury to take its duty seriously, rather than efforts to incite the jury against defendant," and therefore not misconduct].)  Second, as explained above, even if the comments were improper, refraining from drawing attention to them by objecting was arguably a reasonable tactical choice by counsel.

### 2. *Misstatement of the Law of Self-Defense*

Defendant contends that the prosecutor misstated the law of self-defense by suggesting that defendant's "understanding of the situation" was irrelevant to the

17

question of self-defense, as "only the jury's own standards" were relevant. He points to two statements to the jury by the prosecutor: that the jury was entitled " 'to say what is normal, acceptable and reasonable,' " and that the jury "ha[d] to agree that what [Hoang] did was righteous in order to find that it's reasonable." Saterfield adds that the prosecutor's critique of defense counsel's closing argument regarding a cultural divide exacerbated what he characterizes as a misrepresentation of the law regarding reasonableness.

This claim fails for the same reasons explained above. Counsel reasonably could have decided it was better to let the comments stand rather than draw more attention to them by objecting. (*Avena, supra*, 13 Cal.4th at pp. 420-421; *Anzalone, supra*, 141 Cal.App.4th at p. 395.)

3. *Misrepresentation of Burden of Proof and Reasonable Doubt Standard*

Saterfield contends that the prosecutor incorrectly described the standards that apply to self-defense and misstated his burden to show defendants did *not* act in self-defense when he told the jurors to rely on their common sense and experience when deciding whether defendants reasonably believed they had to act in self-defense, rather than considering the scenario from defendants' perspectives. He cites as authority for that argument only a single case that is not at all on point to his contention; we see no misconduct in arguing objective reasonableness. Where there is no objectionable conduct by the prosecutor, there is no ineffective assistance by counsel's failure to object. Further, we cannot see how refraining from objecting to these closing comments could not be a reasonable tactical decision by counsel, considering the instructions that the jury were given and counsel's reliance on those to argue his case. The prosecutor's comments, in the context of argument that spans over 50 pages of reporter's transcript, were not so offensive that trial counsel could not have made a reasonable tactical decision to not emphasize them. (Cf. *People v. Tully* (2012) 54 Cal. 4th 952, 1052 ["remarks

18

occupy[ing] fewer than two pages in an argument that spans over a hundred pages of reporter's transcript" "were a minor point in an extensive argument"].)

Saterfield's claim of prosecutorial misconduct fails, as do his claims of ineffective assistance of counsel.[2]

III

*Mandatory Sentence of Life Without Parole*

Saterfield contends that because he was 21 years old when he committed the murders, the imposition of mandatory LWOP sentences violated the Eighth Amendment to the United States Constitution, article I, section 17 of the California Constitution, and equal protection principles. He did not raise these claims below, but the People agree that we should address them, and we agree with the parties and reach the merits. Having done so, we reject the claims.

A. *Youth Offender Parole Hearings under Section 3051*

"Section 3051 affects three categories of lengthy sentences. A defendant who commits his or her 'controlling offense' at age 25 or younger and who receives a long *determinate sentence* becomes eligible for release on parole 'during his or her 15th year of incarceration.' (§ 3051, subd. (b)(1).) When the sentence for the controlling offense is a *life term of less than 25 years to life*, the offender becomes eligible for parole during the 20th year of incarceration. (§ 3051, subd. (b)(2).) And when the sentence for the controlling offense is *25 years to life*, the offender becomes eligible for parole during the 25th year of incarceration. (§ 3051, subd. (b)(3).) ' "Controlling offense" means the offense or enhancement for which any sentencing court imposed the longest term of imprisonment.' (§ 3051, subd. (a)(2)(B).) . . . .

---

[2] Because we find no prejudicial misconduct to which counsel was obliged to object, need not reach defendant's claim of cumulative error.

"Section 3051 has a carve-out, however . . . . Subdivision (h) of section 3051 expressly excludes from eligibility for a youthful-offender parole hearing any inmate sentenced under the 'Three Strikes' law, under the One Strike law, or to life without possibility of parole (LWOP) for an offense committed after the defendant turned 18." (*People v. Edwards* (2019) 34 Cal.App.5th 183, 194 (*Edwards*).)

B. *The Eighth Amendment Claim*

Saterfield contends that in light of section 3051, judicial "prohibition of mandatory LWOP" to *all* defendants over 18 and younger than 26 "would be consistent with" the analysis in *Miller v. Alabama* (2012) 567 U.S. 460, wherein the United States Supreme Court, building upon earlier cases, outlined a range of factors a sentencing court should consider before ordering a juvenile to serve an LWOP term, consistent with the Eighth Amendment's ban on cruel and unusual punishment.

The most recent California case to consider whether a legal adult may successfully invoke Eighth Amendment sentencing law that pertains to juveniles, ruled: "[A] defendant's 18th birthday marks a bright line, and only for crimes committed before that date can he or she take advantage of [that] jurisprudence in arguing cruel and unusual punishment." (*Edwards, supra*, 34 Cal.App.5th at p. 190, citing *People v. Argeta* (2012) 210 Cal.App.4th 1478, 1482.) We agree.

Therefore, because Saterfield was 21 years old when he committed his crimes, we reject his invocation of the *Miller* line of cases to challenge his sentence.

C. *The Article I, Section 17 Claim*

"A punishment may violate article I, section 17 of the California Constitution if 'it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.' [Citation.] It requires that we 'examine the circumstances of the offense' and the defendant in determining whether the 'the penalty imposed is "grossly disproportionate to the defendant's culpability." ' [Citations.]" (*Edwards, supra*, 34 Cal.App.5th at p. 191.)

20

Contrary to Saterfield's contention, mandatory LWOP for a 21-year-old convicted of special circumstance murder does not shock the conscience. That the California Legislature has seen fit generally to afford youth offender parole eligibility to those under 26 does not render offensive to human dignity the Legislature's concomitant exclusion from such eligibility of those (like Saterfield) who received LWOP sentences for offenses committed after they turned 18. (See *Edwards, supra*, 34 Cal.App.5th at p. 192 ["we find no principled basis for concluding that these sentences . . . fall outside the range where a reviewing court must defer to legislative judgments on criminal sentencing"].)

D. *The Equal Protection Claim*

Saterfield contends that because he is "similarly situated neurologically though not chronologically" to some teenaged juveniles, his exclusion from youth offender parole eligibility violates equal protection principles. Citing *People v. Olivas* (1976) 17 Cal.3d 236, at page 251, Saterfield contends we must apply strict scrutiny review to this claim, as "imprisonment is a deprivation of the fundamental interest in personal liberty." We disagree and apply rational basis review (*People v. Wilkinson* (2004) 33 Cal.4th 821, 837 [limiting *Olivas*, and holding that rational basis review generally is applicable to equal protection challenges to penal statues]) to conclude that this claim lacks merit.

Both federal and state constitutional provisions protect the right to equal protection of law. " 'The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner.' [Citations.] This initial inquiry is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.' " (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253.)

By its own terms, section 3051 excludes from relief nonjuvenile LWOP offenders. Saterfield cannot show that he is similarly situated to juvenile LWOP offenders, since "children are constitutionally different from adults for purposes of sentencing." (*Miller v.*

21

*Alabama, supra*, 567 U.S. at p. 471.)  Moreover, Saterfield cannot show that he is similarly situated to offenders who commit their crimes when they were younger than 25 and were not sentenced to LWOP, since such offenders receive different sentences because they have been convicted of different crimes.  (*People v. Macias* (1982) 137 Cal.App.3d 465, 473 ["persons convicted of different crimes are not similarly situated for equal protection purposes"]; see *People v. Pecci* (1999) 72 Cal.App.4th 1500, 1503 ["persons convicted of different offenses can be punished differently"].)  His equal protection argument fails.[3]

---

[3]  In his reply brief, Saterfield contends the People failed to address his request for remand to establish *Miller* factors.  But he did not head and argue that request in his opening brief, but merely cursorily made it in his conclusion.  (See Cal. Rules of Court, rules 8.204(a)(1)(B) and 8.360(a).)  Therefore, we will not consider the claim.  (See *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 408 [defendant's "recast[ed]" claim in his reply brief "is forfeited by the failure to raise it in the opening brief"].)  Further, Saterfield was sentenced years after *Miller* and *Franklin* were decided.  Accordingly, he forfeited the chance to put evidence before the trial court at sentencing by failing to request it below.  (See *People v. Medrano* (2019) 40 Cal.App.5th 961, 968, fn. 9 ["forfeiture rules that apply to countless other rights in criminal proceedings" apply to the right to a *Franklin* proceeding].)

DISPOSITION

The judgments are affirmed.


_____/s/_____

Duarte, J.

We concur:



_____/s/_____

Raye, P. J.




_____/s/_____

Mauro, J.